DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**R.J. REYNOLDS TOBACCO COMPANY** and **PHILIP MORRIS USA INC.**,
Appellants,

v.

**MYRON KAPLAN**, as Personal Representative of the
ESTATE OF SHEILA KAPLAN**,**
Appellee.

No. 4D18-2880

[December 9, 2020]

Appeal and cross appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Carlos A. Rodriguez, Judge; L.T. Case No. 08-025823.

Scott A. Chesin and Michael Rayfield of Mayer Brown LLP, New York, NY, and Geoffrey J. Michael of Arnold & Porter Kaye Scholer LLP, Washington, DC, for appellant Philip Morris USA Inc.

William L. Durham II and Val Leppert of King & Spaulding LLP, Atlanta, GA, for appellant R.J. Reynolds Tobacco Co.

Bard D. Rockenbach of Burlington & Rockenbach, P.A., West Palm Beach, and Scott P. Schlesinger, Jonathan R. Gdanski and Brittany Chambers of Schlesinger Law Offices, P.A., Fort Lauderdale, for appellee.

CONNER, J.

R.J. Reynolds Tobacco Company and Philip Morris USA, Inc. (collectively, "Tobacco") appeal a judgment in favor of Myron Kaplan ("Plaintiff"), as personal representative of the estate of Sheila Kaplan ("Decedent"). Tobacco raises five issues on appeal. We affirm as to all five issues without discussion, except for the issue concerning two egregiously improper closing arguments by Plaintiff's counsel. We choose to discuss that issue because the problem is recurring, and the trial court improperly overruled objections to the arguments. We stress once again how important it is that trial judges curb improper closing arguments designed to appeal to the emotions and passions of jurors. In this case, as happens with frequent recurrence, we cannot conclude the obvious attempt to

inflame the jury was successful and thus resulted in reversible error. Regardless, inflammatory improper arguments must be stopped to maintain public confidence in our system of justice.

*Background*

Decedent began smoking cigarettes at age 14 or 15, including brands manufactured by Tobacco. Plaintiff and Decedent married in 1964. When Plaintiff first met Decedent, she was a "heavy smoker." Decedent was eventually diagnosed with a lung tumor in 1994, leading to surgery to remove one of her lungs. After the surgery, Decedent quit smoking. Although the doctors thought she was in remission, her cancer returned and she eventually died.

Plaintiff filed a six-count complaint against Tobacco making the usual *Engle*[1] progeny case claims. As typical with *Engle* cases, the trial was conducted in two phases. Much of the evidence in Phase I revolved around the issue of whether Decedent died of a form of lung cancer established by the *Engle* findings to be caused by smoking.

During the initial closing argument in Phase I, immediately after making reference to the *Engle* findings, Plaintiff's counsel made the following argument, to which Tobacco objected:

| [Plaintiff Counsel]: | Now, the obligation would have been, upon the discovery in the '50s of this terrible truth about their product, would have been stop making it or fix it. And they fooled the public health, right? Even they—even— |
| | |
| | They even had that third-party strategy of corrupting scientists to do their bidding and to fool public health officials into saying, well, if you got to smoke, smoke the filters. And that went on for decades and decades. So that's another form of reassurance. The public health authority were unwitting dupes. They were helping. |

---

[1] *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246 (Fla. 2006).

2

So that's the *Engle* finding. That's the *Engle* trial. And these are your findings, right? These are—

There are blood, sweat and tears to get these things.

[Tobacco Counsel]: Objection, Your Honor; improper argument.

THE COURT: Overruled.

[Plaintiff Counsel]: It's like the movie "Schindler's List," right? There's a scene in "Schindler's List" where he holds up the list — it's the most powerful scene in the movie, as far as I'm concerned — he holds up the list and he shows the list of the names, the 800 names they're going to pull out of the concentration camp and save their lives —

[Tobacco Counsel]: Objection, Your Honor; improper argument.

THE COURT: Overruled.

[Plaintiff Counsel]: — and he says — he says —

He goes, the list is an absolute good. He says, the list is life. He says, all around it is the void. All around it is the darkness.

This list of rulings [the *Engle* findings] for you is an absolute good. It's an absolute good.

Tobacco again objected and asked for a sidebar. At sidebar, the following exchange occurred:

[Tobacco Counsel]: He just analogized [Tobacco] to the Germans . . . to the Germans in the Holocaust. The victims of cigarette

3

> smoking and the victims of the Holocaust.
>
> That is incredible. That is such a violation of proper argument. Characterizing [Tobacco] as Nazis, as being like those that killed — engaged in a genocide?

THE COURT: Well, I understand your objection, but I didn't get that out of it. He was talking about a movie and a list, and he mentioned the — . . . .

Plaintiff's counsel interjected that in *Engle*, the Third District reversed in part because Engle's counsel made a direct comparison of the tobacco companies to the Nazis; however, our supreme court reinstated the verdict after deciding the comparison was over the line, but not grounds for reversing a long trial. The trial court responded:

THE COURT: Right.

[Plaintiff Counsel]: Here, I'm not talking about —

I didn't compare them to Nazis. I'm not talking about —

THE COURT: You didn't go anywhere near that.

[Tobacco Counsel]: Holocaust is right in the middle of it. Sorry to interrupt.

THE COURT: No; I mean, he didn't go — he didn't go there. . . .

The trial court overruled the objection to the *Schindler's List* argument and asked if Tobacco was moving for mistrial. After Tobacco orally moved for mistrial at sidebar, the trial court reserved ruling. After the Plaintiff's initial closing argument, Tobacco again moved for a mistrial based on the *Schindler's List* argument, as well as multiple sustained objections during the initial closing. The trial court again reserved ruling.

Later, Plaintiff's counsel ended his rebuttal closing argument in Phase I as follows:

4

[Plaintiff Counsel]: Let me finish with this. There is a passage from a book I want to read briefly. It is a book by George Orwell called *1984.*

It was made into a movie, okay. Jonathan Hurt, who is long gone and Richard Burton, who is long gone, academy award-winning actor, played the roles in the movie.

And the actor, Hurt, was the victim; and Big Brother was Richard Burton. And he —

[Tobacco Counsel]: Objection, Your Honor, improper argument.

THE COURT: Overruled.

[Plaintiff Counsel]: — he's standing over Winston, who he's about to torture, so he can make his mind right, so he can have nothing but the love of Big Brother.

He's standing over him, and this is what he says. And above all, Winston — no, sorry — and above all, we do not allow the dead to rise up against us. You must stop imagining that posterity will vindicate you, Winston.

Posterity will never hear of you. You will be lifted clean out from the stream of history. We shall turn you into a gas and pour you into the stratosphere. Nothing will remain of you, not a name in a register.

[Tobacco Counsel]: Objection, Your Honor, this is improper argument.

THE COURT: Overruled.

[Plaintiff Counsel]:  Not a memory in a living brain — not a name in a register, not a memory in a living brain. You will have been annihilated in the past, as well as in the future. You will never have existed.

When you go back there and you make this right and you do justice, you will prove that that passage will not come true for my client, [Decedent].

After Phase I of the trial, the jury returned a verdict for compensatory damages for past pain and suffering in the amount of $1.58 million, $520,000 for future damages and $7,211 for funeral expenses. The jury also found by clear and convincing evidence that punitive damages were warranted against both tobacco companies, and, at the end of Phase II, the jury awarded Plaintiff punitive damages totaling $2,971,000.

After the verdict was entered, Tobacco moved for a new trial, raising multiple grounds. One such ground was multiple improper closing arguments, including the *Schindler's List* and the *1984* arguments. After denying the motion for new trial, the trial court entered a final judgment in conformity with the jury's verdicts. Tobacco gave joint notice of appeal.

*Appellate Analysis*

Although Tobacco's motion for new trial argued several instances of improper closing argument, Tobacco's appeal focuses primarily on the *Schindler's List* and *1984* arguments, and gives little attention to the other asserted improper arguments (the initial brief devoted a total of three pages of analysis regarding the improper closing argument issue). Hence, we similarly confine our analysis to those two arguments.

As our supreme court and we have stressed:

The purpose of closing argument is to help the jury understand the issues in a case by "applying the evidence to the law applicable to the case." *Hill v. State*, 515 So. 2d 176, 178 (Fla. 1987). Attorneys should be afforded great latitude in presenting closing argument, but they must "confine their argument to the facts and evidence presented to the jury and all logical deductions from the facts and evidence." *Knoizen v. Bruegger*, 713 So. 2d 1071, 1072 (Fla. 5th DCA 1998); *see*

6

also *Venning v. Roe*, 616 So. 2d 604 (Fla. 2d DCA 1993). Moreover, closing argument must not be used to "inflame the minds and passions of the jurors so that their verdict reflects an emotional response . . . rather than the logical analysis of the evidence in light of the applicable law." *Bertolotti v. State*, 476 So. 2d 130, 134 (Fla. 1985).

*Murphy v. Int'l Robotic Sys., Inc.*, 766 So. 2d 1010, 1028 (Fla. 2000) (alteration in original); *see also R.J. Reynolds Tobacco Co. v. Grossman*, 211 So. 3d 221, 226 (Fla. 4th DCA 2017); *Philip Morris USA, Inc. v. Tullo*, 121 So. 3d 595, 600 (Fla. 4th DCA 2013). We have repeatedly "caution[ed] counsel to be vigilant in crafting closing arguments that fall within the confines of permissibility." *Tullo*, 121 So. 3d at 602; *see also Sanchez v. Martin*, 248 So. 3d 1174, 1178 (Fla. 4th DCA 2018); *Cohen v. Philip Morris USA, Inc.*, 203 So. 3d 942, 948 (Fla. 4th DCA 2016); *R.J. Reynolds v. Calloway*, 201 So. 3d 753, 765 (Fla. 4th DCA 2016). With regards to closing arguments, we have also explained that trial judges "retain[] the ultimate responsibility to ensure proper behavior of trial counsel and fair trial proceedings in his or her courtroom" and it is their duty to curb improper argument to "ensur[e] that the jury [is] not being led astray." *Calloway*, 201 So. 3d at 763. We have observed that the responsibility of trial judges to not let improper arguments lead the jury astray is especially important "in lengthy, high-stakes cases where a trial court's failure to control the litigants not only deprives the parties of a fair trial, but can ultimately result in scarce judicial resources being consumed when the case is remanded for re-trial based on those actions." *Id.*

"A trial court's order granting or denying a motion for a new trial based on either objected-to or unobjected-to improper argument is reviewed for abuse of discretion." *Engle*, 945 So. 2d at 1271.

We apply different standards to a ruling on a motion for new trial based on improper closing argument depending on whether the comments challenged as improper are preserved or unpreserved. For preserved comments, "the trial court should grant a new trial if the argument was 'so highly prejudicial and inflammatory that it denied the opposing party its right to a fair trial.'"

*Allstate Ins. Co. v. Marotta*, 125 So. 3d 956, 960 (Fla. 4th DCA 2013) (quoting *Engle*, 945 So. 2d at 1271).

"A party may not give a closing argument . . . that is 'designed to inflame the emotions of the jury rather than prompt a logical analysis of the

7

evidence in light of the applicable law.'" *Calloway*, 201 So. 3d at 760-61 (quoting *Intramed, Inc. v. Guider*, 93 So. 3d 503, 507 (Fla. 4th DCA 2012)); *see also Norman v. Gloria Farms, Inc.*, 668 So. 2d 1016, 1020–21 (Fla. 4th DCA 1996) (it is impermissible to "appeal to the passions and prejudices" of the jury in closing arguments). Closing arguments designed to appeal solely to passion and sympathy are improper. *See Homeowners Choice Prop. & Cas. Ins. v. Kuwas*, 251 So. 3d 181, 186 (Fla. 4th DCA 2018). With regard to improper closing arguments that are found to be designed to appeal solely to passion and sympathy, a new trial should nonetheless be granted only "if the error complained of has resulted in a miscarriage of justice." *Kelley v. Mutnich*, 481 So. 2d 999, 1001 (Fla. 4th DCA 1986) (quoting *City of Hollywood v. Jarkesy*, 343 So. 2d 886, 888 (Fla. 4th DCA 1977)). In order to demonstrate a miscarriage of justice, "it must be shown that the verdict was induced by prejudice or passion." *Ford v. Robinson*, 403 So. 2d 1379, 1383 (Fla. 4th DCA 1981) (quoting *Jarkesy*, 343 So. 2d at 888).

Regarding the *Schindler's List* argument, Tobacco argued below that the Plaintiff was essentially likening tobacco companies to Nazis. The trial court agreed that such a comparison "would be extremely prejudicial and outside the scope of evidence," but did not think the reference to the movie created an inference that Tobacco was like the Nazis. With all due respect to the trial court, the import of comparing the *Engle* findings to the "absolute good" of Schindler's List, listing 800 names which were going to be "pull[ed] out of the concentration camp and save their lives" is a clear analogy comparing Tobacco to the Nazis. Even a person serving on a jury who had not seen *Schindler's List* would make that connection, despite the fact that Plaintiff's counsel did not specifically mention Germany, World War II, or the Nazis. More importantly, while the trial court may not have thought that the reference to the movie likened Tobacco to the Nazis, "[w]hat the jury hears or may understand or infer is the critical point." *Harris v. State*, 381 So. 2d 260, 261 (Fla. 5th DCA 1980).

Although Plaintiff's counsel did not use the term "Nazis," saving people from concentration camps certainly implies saving them from the Nazis. Plaintiff's counsel's explanation to the trial court regarding the meaning of his statement is also revealing:

> [Plaintiff Counsel]: First of all, Stanley Rosenblatt, in *Engle*, said, how do you justify what the Nazis did? How do you justify what slavery was?
>
> THE COURT: Right.

8

> [Plaintiff Counsel]:   That's the Holocaust, and *that's what the cigarette companies did.*   So they — so they're trying to —

(emphasis added).   The proffered explanation admits that Plaintiff's counsel was contending that in *Engle* there was an analogy between the activities of Tobacco and the activities of the Nazis.   The continued conversation surrounding the explanation reveals more.   The trial court asked if the reference to Nazis was reversed in *Engle*.   Plaintiff's counsel responded that the Third District reversed, but pointed out that the Florida Supreme Court "said it was over the line" *but not sufficient to reverse.* Plaintiff's counsel then said and the trial court responded:

> [Plaintiff Counsel]:   Here, I'm not talking about –
>
> I didn't compare them to Nazis.   I'm not talking about –
>
> THE COURT:   You didn't go anywhere near that.

Again, with all due respect to the trial court, counsel not only went near that, he went way over the line.   Significantly, although Plaintiff's counsel's argument was that he did not *directly* compare Tobacco to the Nazis, it is telling that counsel stressed that even if he had done that, our supreme court did not reverse on a similar argument in *Engle*.   Counsel's argument that because no court has directly said that the *Schindler's List* analogy is improper is unavailing.   To so hold would invite this and other courts to play "whack-a-mole"[2] by batting down every new and creative Nazi reference that can be devised.  We conclude from the proffered explanation that Plaintiff's counsel took a calculated risk that he could make such an *oblique* comparison to Tobacco acting like Nazis and get away with it.

What is particularly noteworthy is that before both the trial court and this Court, Plaintiff has proffered no logical explanation of how a list of names relates to a list of findings in a court proceeding.   Our conclusion that Plaintiff's counsel was attempting to get by with an oblique, but obvious, comparison of Tobacco to the Nazis is amplified by the fact that

---

[2] "Whack-a-mole" is an arcade game in which players use a mallet to hit toy moles, which appear at random, back into their holes.   *See Whack-a-mole,* LEXICO, *https:/lexico.com/en/definition/whack-a-mole* (last visited December 1, 2020).

the proffered explanation to the trial court suggested that the supreme court opinion in *Engle* focused on a reference to Nazis in closing arguments in that case, when in fact there is little discussion in *Engle* about improper arguments referencing Nazis; instead, the supreme court's primary emphasis was on the improper arguments regarding race.

Regarding the *1984* rebuttal argument, what is most striking is its focus on describing the context of the scene to give additional emphasis to the words quoted to the victim. More specifically, counsel described that Winston was about to be tortured and his mind reprogrammed. Not only was the argument an appeal to sympathy by focusing on the torture Winston was about to endure, it was a direct appeal to the jury's emotions, given the graphic context of the situation in which the words were spoken. It is also extremely significant that the description of the scene was *a second attempt to obliquely compare Tobacco to a torturous authoritarian regime*. Perhaps most striking to our analysis, Plaintiff was unable to logically explain during oral argument how the following final exhortation to the jury was not a direct appeal to render a verdict based on emotion:

> When you go back there and you make this right and you do justice, you will prove that that passage will not come true for my client, [Decedent].

We agree with Tobacco's argument that the *Schindler's List* and *1984* arguments were solely designed to inflame the passions of the jury. It is also disturbing that on at least *four* prior occasions, this court has addressed improper inflammatory closing arguments appealing to passion by trial counsel Scott P. Schlesinger or his firm Schlesinger Law Offices, P.A. *See Oshinsky-Blacker v. Philip Morris USA, Inc.*, L.T. Case No. CACE08-025841 (Fla. 17th Cir. Ct. Mar. 6, 2017), *aff'd*, 249 So. 3d 643 (Fla. 4th DCA 2018) (per curiam, affirming new trial); *Cohen*, 203 So. 3d at 948 (affirming the trial court's granting a new trial because "counsel made arguments which crossed the line into 'take responsibility' and 'apologize' territory," characterizing counsel's arguments as "improper" and "egregious and unacceptable"); *Calloway*, 201 So. 3d at 761 ("These comments were designed for no other purpose than to inappropriately evoke sympathy from the jury."); *Tullo*, 121 So. 3d at 601 (determining that the argument implying tobacco companies were as culpable as drug dealers was improper). Three of these cases resulted in a new trial, and the fourth, *Tullo*, very well may have but for the defense's failure "to raise a contemporaneous objection to any of the challenged comments." *Id.* As our supreme court stated in *Engle* with respect to the closing argument statements of counsel in that case, we similarly "condemn these tactics of" Mr. Schlesinger and conclude that, in the above-cited cases as well as the

instant case, his "conduct [was] unbecoming an attorney practicing in our state courts." *Engle*, 945 So. 2d at 1273.

"If the issue of an opponent's improper argument has been properly preserved by objection and motion for mistrial, the trial court should grant a new trial if the argument was so highly prejudicial and inflammatory that it denied the opposing party its right to a fair trial." *Tullo*, 121 So. 3d at 600 (quoting *Engle,* 945 So. 2d at 1271). Unlike *Engle*, wherein several of defense counsel's objections to inappropriate comments by defense counsel were sustained, *see* 945 So. 2d at 1273, here the trial court improperly overruled all of Tobacco's objections with respect to the *Schindler's List* and *1984* analogies. Fortunately, Plaintiff's counsel's intent to improperly inflame or prejudice the jury was not successful. In the Phase I closing arguments, Plaintiff urged the jury to return a verdict of $8 million for compensatory damages. Instead, the jury returned a verdict for approximately one-fourth of the amount requested: $2,107,211. Similarly, the punitive damage verdict after Phase II for approximately $3 million was substantially less than the amount requested.

After examining the record closely, we cannot conclude that the two grossly improper closing arguments raised on appeal were, "under the totality of the circumstances," *Engle*, 945 So. 2d at 1274, sufficient to rise to reversible error. Thus, we affirm the denial of the motion for new trial.

Because the trial court *incorrectly* overruled the objections to the *Schindler's List* and *1984* arguments, we repeat with emphasis what we said in 1994:

> **The fact that appellate courts proscribe misconduct by trial counsel, unfortunately, does not seem to eliminate it. It is therefore of vital importance that trial judges, when objections are raised to improper argument as they were in this case, properly exercise their duties by stepping in and curbing it.**

*Bellsouth Human Res. Admin., Inc. v. Colatarci*, 641 So. 2d 427, 430 (Fla. 4th DCA 1994) (emphasis added).

Improper closing argument continues to be a major problem that undermines public confidence in our system of justice. For that reason, we emphatically reemphasize a point we made in *Calloway*: **it is "the ultimate responsibility [of trial judges] to ensure proper behavior of trial counsel and fair trial proceedings in his or her courtroom" and it is their duty to curb improper argument to "ensur[e] that the jury**

**[is] not being led astray.”** *Calloway*, 201 So. 3d at 763 (emphasis added). **“A trial judge should respond to such improper argument in a timely and consistent manner, and issue proportional rebukes when repeated instances occur.”** *Id.* (emphasis added). When improper opening statements or closing arguments are repeated, the rebukes should be in front of the jury. If the behavior continues, we also remind trial judges of the option of using indirect civil contempt monetary sanctions for repeated violations of court rulings. *See, e.g., Moakley v. Smallwood*, 826 So. 2d 221, 226 (Fla. 2002) (holding that a trial court possesses the inherent authority to impose attorney's fees against an attorney for bad faith conduct).

*Affirmed.*

FORST, J., concurs.
KLINGENSMITH, J., concurs with opinion.

KLINGENSMITH, J., concurring.

I reluctantly concur in the majority opinion but write to address a shortcoming in our jurisprudence, as highlighted by this case. During oral argument, appellee's counsel implored this court not to punish their client for trial counsel's improper argument by reversing the jury's verdict. In follow up, we asked counsel how we should deal with issues of repeated attorney misconduct *other than* by reversing cases where the boundaries of permissible argument set forth by this and other courts have been flouted. The response we received was essentially, "I don't know." Succinctly put, neither do we.

We have previously said that appellate courts should not reverse cases solely because of attorney misconduct where both sides engage in unprofessional behavior. *See Lemoine v. Cooney*, 514 So. 2d 391, 393 (Fla. 4th DCA 1987) ("Where each party's attorney engages in vituperation, it would be unfair to the litigant who won in the trial court to lose on appeal merely because his lawyer likewise participated in less than gentlemanly conduct."). It is the trial court's responsibility to both monitor and deter improper conduct, and the trial court must fulfill this responsibility when the conduct occurs. *See Bellsouth Human Res. Admin., Inc. v. Colatarci*, 641 So. 2d 427, 430 (Fla. 4th DCA 1994) ("It is the trial court's responsibility, when objections are made to improper argument, to sustain the objections and let counsel know that these tactics will not be tolerated."). Because we are constrained by stare decisis, we are often limited to merely chastising offenders when the misconduct did not result in an unfair trial. *See Jeep Corp. v. Walker*, 528 So. 2d 1203, 1204 (Fla.

12

4th DCA 1988) ("[I]t is not for us to substitute our judgment for that of the trial judge . . . unless we are convinced that a fair trial did not result."). If trial judges fail to vigilantly enforce standards of professional conduct, and if appellate courts are constrained in how we can thereafter respond, the result is untenable. Trials will simply become nothing more than games of chance where the goal is to get a favorable outcome at any cost, then roll the dice betting the appeals court will affirm. This court has discussed the problem since the late 1970s. *See Lemoine*, 514 So. 2d at 393; *Nelson v. Reliance Ins. Co.*, 368 So. 2d 361, 361 (Fla. 4th DCA 1978) ("We are distressed at an increasing tendency, by the trial bar, to permit the noble art of trial practice to degenerate into a free-for-all."); *Jeep Corp.*, 528 So. 2d at 1204. The fact that we are still discussing it as an ongoing issue, after over forty years, is remarkable.

Clearly, whatever we have previously written on this subject has failed to take hold. For that reason, I believe the time has come to take a different course in the future—one that includes our court taking a more active role in how we deal with the misconduct of trial attorneys. This might include reconsidering our prior holdings that advised against reversing cases based on attorney misconduct, especially in cases such as this where the improper conduct was unilateral. *Cf. Lemoine*, 514 So. 2d at 393. Today we hold that the results obtained by appellee at trial did not indicate the offensive comments had any effect on the jury. But if *Special v. West Boca Medical Center*, 160 So. 3d 1251 (Fla. 2014), stands for anything, it is the notion that the burden lies with the appellee, who potentially benefitted from the grossly improper arguments, to prove that the comments had no effect on the jury. *Id.* at 1256. That is a difficult standard to apply, especially in cases where the benefit to the appellee cannot be precisely measured by the amount of compensatory or punitive damages awarded. In some cases, the benefit might simply be the jury's decision to award punitive damages in the first place—at *any* amount. But that is an issue we leave for another day.

In my opinion, arguments like the veiled reference made here comparing appellants to Nazis are so outrageous that, going forward, we should hold that they constitute grounds for reversal in all but a very few circumstances because "neither rebuke nor retraction may entirely destroy their sinister influence." *Norman v. Gloria Farms, Inc.*, 668 So. 2d 1016, 1023 (Fla. 4th DCA 1996) (quoting *Baggett v. Davis*, 169 So. 372, 379 (1936)); *see also Murphy v. Int'l Robotic Sys., Inc.*, 766 So. 2d 1010, 1027 (Fla. 2000) (stating that a litigant must either object at trial or make a motion for new trial to preserve an argument that opposing counsel's comments amount to fundamental error). I have no doubt this court would so hold and properly reverse had counsel's argument instead used an

analogy comparing the appellants and their actions to the Ku Klux Klan, lynching, or anything else designed solely to evoke the strongest negative visceral reaction from the jury.

It is unfortunate that innocent litigants may ultimately suffer a reversal of their cases through no direct fault of their own, but this should not serve as an impediment to our action. Litigants suffer when appellate courts reverse cases for a variety of reasons, including improper argument. They also suffer when appellate courts affirm outright dismissals of cases caused by clear attorney malpractice. *See Spaziano v. Price*, 763 So. 2d 1047, 1048 (Fla. 4th DCA 1999) (discussing the Third District's affirmance of a case in which a law firm failed to file a cause of action before the statute of limitations, thus causing the firm to be sued for legal malpractice). Although a reversal deprives the litigant of the result achieved at trial, the effect of that reversal is far less draconian than a dismissal because it leads to a new trial—one where the desired results can be achieved under much fairer circumstances. By declining to reverse cases solely because of attorney misconduct, attorneys who flagrantly ignore the rules are permitted to benefit from their malfeasance. When there is no real sanction for such behavior and thus no effective deterrence, something must change. But make no mistake; the primary responsibility for curbing misconduct lies first and foremost with the trial judge. If trial judges took greater care to ensure that such actions are not tolerated, there would be no need for our court to be involved.

There is an old saying that "there is no education in the second kick of a mule." Our opinion in this case provides the fifth—and hopefully *final*—kick needed to emphatically deliver the majority's message to this trial counsel specifically, and to trial judges more generally. We have made our expectations clear, and our tolerance should not be expected in the future.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***

14